Joseph J. Tabacco, Jr. (SBN 75484)
Christopher T. Heffelfinger (SBN 118058)
Anthony D. Phillips (SBN 259688)
**BERMAN DEVALERIO**
One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
jtabacco@bermandevalerio.com
cheffelfinger@bermandevalerio.com
aphillips@bermandevalerio.com

*Proposed Interim Liaison Counsel for Plaintiffs*

Michael J. Boni (Admitted 09/11/92)
**BONI & ZACK LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: (610) 822-0200
Facsimile: (610) 822-0206
mboni@bonizack.com

*Proposed Interim Co-Lead Counsel for Plaintiffs*

Other Counsel Appear On Signature Page

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| **IN RE APPLE IN-APP PURCHASE LITIGATION** | Master File No. 11-cv-1758 JF |
| **This Document Relates To:**<br><br>    **All Actions.** | **CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Garen Meguerian, Lauren Scott, Kathleen Koffman, Heather Silversmith and Twilah Monroe, individually and on behalf of the class described below, by and through their attorneys, make the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to allegations specifically pertaining to Plaintiffs and counsel, which are based on personal knowledge.

## I.   OVERVIEW OF THE ACTION

1.    In addition to its distinction as a market leader in the manufacture, marketing and sale of computers and computing devices, defendant Apple Inc. ("Apple" or "Defendant") is also the leading seller of "Apps," *i.e.*, software applications that users download on their mobile computing devices, such as Apple's iPhone, iPod, iTouch or iPad devices.  Among the many thousands of Apps that Apple offers for sale are gaming Apps targeted at children.  Although numerous gaming Apps are offered for free and may be downloaded at no cost, many such games are designed to induce purchases of what Apple refers to as "In-App Purchases" or "In-App Content," *i.e.*, virtual supplies, ammunition, fruits and vegetables, cash and other fake "currency" within the game in order to play the game as it was designed to be played ("Game Currency").  These games are highly addictive, designed deliberately so, and tend to compel children playing them to purchase large quantities of Game Currency, amounting to as much as $100 per purchase or more.  As such, the sale of Game Currency to children is highly lucrative.

2.    Plaintiffs bring this class action on behalf of themselves and other parents and guardians who (a) downloaded or permitted their minor children to download a supposed free App from Apple  and (b) then incurred charges for game-related voidable purchases that the minor children were induced by Apple to make, without the parents' and guardians' knowledge or permission.

3.    Apple requires its users to authenticate their accounts by entering a password prior to purchasing and/or downloading an App or buying Game Currency.  Until recently, however, once the password was entered, Apple permitted the user, even if a minor, to buy Game Currency for up to fifteen minutes without re-entering the password.  This practice enabled

minors to buy Game Currency, in one-click sums of $99.99 or more, without entering a password, causing Apple to pocket millions of dollars from such Game Currency transactions with minors and without the knowledge or permission of their parents, whose credit cards or PayPal accounts are automatically charged for the purchases.  Further, because the passwords now required for purchases of Game Currency are the same passwords required for any Apple purchase, minors who are aware of their parents' password may purchase Game Currency without the knowledge or permission of their parents for subsequent purchases.

4.      Apple's practice of selling Game Currency to children, garnering millions of dollars of ill-gotten gains thereby, has attracted the attention of the Federal Trade Commission ("FTC").  Such attention caused Apple in early 2011 to begin requiring the entry of a password for all individual transactions, and to warn users that "free" games may contain In-App content for sale.  Nevertheless, Apple continues to sell Game Currency to minors, evidently raking in more than $1 million per month from the "Smurfs' Village" App alone.

5.      Plaintiffs bring this action for declaratory, equitable and monetary relief under the Declaratory Judgment Act, California's contract laws, Consumers Legal Remedies Act, Business and Professions Code Sections 17200 *et seq.*, and/or for Unjust Enrichment.

## II.      JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d).  This is a class action involving more than 100 class members.  Four of the five Plaintiffs are citizens of states different from Defendant, and the amount in controversy, in the aggregate, exceeds the sum of $5 million exclusive of interest and costs.

7.      Defendant is a California corporation, has its principal place of business in Cupertino, California, transacts business in this District, has subjected itself to this Court's jurisdiction through such activity, and a substantial part of the events and omissions giving rise to this claim occurred in this District. Accordingly, venue is proper in this District under 28 U.S.C. § 1391.

III.     PARTIES

8.      Plaintiff Garen Meguerian resides in Phoenixville, Pennsylvania with his wife and their twelve and nine-year-old daughters.  Mr. Meguerian permitted his younger daughter to download from iTunes a number of free gaming Apps, including "Zombie Café," "Treasure Story" and "City Story."  Mr. Meguerian, however, was completely unaware of the fact that within the span of a few weeks she bought such Game Currency as "Zombie Toxin," "Gems" and "City Cash."  Those transactions between Apple and a nine-year-old child cost Mr. Meguerian approximately $200.

9.      Plaintiff Lauren Scott resides in Granbury, Texas with her husband and their 3½-year-old son.  Ms. Scott downloaded onto her iPhone the "free" gaming App "Tap Zoo."  Because it said it was "free," Ms. Scott entered her password in her iPhone, and handed the iPhone to her son.  ***Within 60 seconds***, her account was charged $99.99 plus tax ($8.25) for such Game Currency as a "Trunk of Coins."  That transaction between Apple and a 3½-year-old child cost Ms. Scott $108.24 within one minute after she entered her password and handed her iPhone to her son.

10.      Plaintiff Kathleen Koffman resides in Gardena, California with her nine-year-old son.  Ms. Koffman downloaded the "free" gaming Apps "X-Mas Resort" and "F.A.S.T." onto her iTouch for her son.  Ms. Koffman, however, was completely unaware of the fact that within ***several days***, her account was charged $338.72 for such Game Currency in the X-Mas Resort App as "Shells," and $329.87 for such Game Currency in the F.A.S.T. App as "Missiles" and other forms of ammunition.

11.      Plaintiff Heather Silversmith resides in Rockville, Maryland with her husband, their seven-year-old son and six-year-old daughter.  Without Ms. Silversmith's knowledge and permission, Ms. Silversmith's daughter purchased "Gems" while playing the "Fashion Story" App, and Ms. Silversmith's iTunes account was charged $99.99 for her six-year-old daughter's purchase.

12.      Plaintiff Twilah Monroe resides in McAlester, Oklahoma with her husband and

1   their twin six-year-old daughters.  Ms. Monroe opened an iTunes account, placing her debit card

2   on file to make purchases.  In June 2010, Ms. Monroe downloaded onto her iPhone the "free"

3   gaming App "Fishies."  Ms. Monroe then handed the iPhone to one of her (then-five-year-old)

4   daughters, so that her daughter could play the "free" game.  Two or three days later, Ms. Monroe

5   checked her debit card account online, and discovered that iTunes charged her account $99.99

6   for such Game Currency as a "Chest of 1,250 Pearls."  Apple denied Ms. Monroe's email and

7   telephonic requests for a refund.

8          13.    Defendant Apple is a California corporation with its principal place of business in

9   Cupertino, California.

10   **IV.    FACTUAL ALLEGATIONS**

11         14.    Apple is one of the leading manufacturers and sellers of computing products,

12   including the iMac desktop computer, MacBook laptops, iPad tablets, iPhone smart phones, and

13   iPod and iTouch handheld music players and gaming devices.

14         15.    Apple also sells content (*e.g.*, music, movies, TV shows, audio books and Apps)

15   that can be downloaded on its and other manufacturers' computing devices.  Apple sells Apps

16   through its "App Store," which may be accessed directly from certain devices (*e.g.*, iPads,

17   iPhones and iTouches) or through other Apple-owned retail outlets (*e.g.*, iTunes, App Store,

18   iBookstore).

19         16.    Apple offers Apps in many genres, including travel, business, education, finance,

20   entertainment and games.  Games are the most downloaded of all genres.  Apps can be

21   downloaded for free, or for a licensing fee that ranges from $.99 to $9.99 or more.  It is the

22   gaming Apps that Apple targets and sells to minor children that are the subject of this action.

23         17.    Apple is by far the leading retailer of Apps.  Apps are either developed by Apple

24   or licensed to Apple by independent App developers.  The App developers license their Apps to

25   Apple for sale to consumers, and Apple splits the revenues earned from the sale of the App, or

26   from the sale of In-App Purchases, with the App developer.

27         18.    Apple supervises and controls the function and operation of the Apps it sells.

28

1  Before an App is made available by Apple, Apple staff test the App and confirm its compliance

2  with dozens of rules that Apple unilaterally imposes.  If Apple deems an App noncompliant with

3  Apple's rules, Apple will not make the App available for sale.

4        19.    In all instances relevant to this action, the sale of the App and/or any Game

5  Currency is a transaction directly between Apple and the consumer.  There is no privity between

6  the user and the developer of the App (unless Apple itself is the App developer).  Apple, and

7  Apple alone, is the provider of the App to the user.  Apple charges its customers' credit (or debit)

8  card or PayPal account, or processes iTunes gift cards, and no App developer ever receives an

9  Apple App customer's credit (or debit) card number or PayPal account information.

10        20.    Anyone thirteen years old or older can open an account to purchase (*i.e.*, license)

11  content from Apple.  Opening an account requires, among other things, selecting a user name

12  and password, providing certain contact and other information, and agreeing to Apple's Terms &

13  Conditions.  Users may then make purchases in any of a number of ways, including payment by

14  "iTunes Cards," "iTunes Gift Certificates," "Content Codes," "Allowance Account balances,"

15  and, most frequently, by supplying Apple with a credit or debit card number or PayPal account.

16  For users who specify credit or debit card or PayPal payment, Apple automatically draws funds

17  from the account holder's credit or debit card or PayPal account.

18        21.    Prior to downloading an App, Apple requires account holders to enter their

19  password.  Until recently, however, once the account holder entered that password, he or she (or

20  in cases relevant to this Complaint, his or her minor child) could make purchases for up to fifteen

21  minutes without re-entering the password.  Thus, a parent could enter his or her password to

22  permit a child to download a free gaming App, and then allow the child to download and play the

23  game.  What Apple did not tell parents, however, is that their child was then able to purchase

24  Game Currency for fifteen minutes without any supervision, oversight or permission.

25        22.    In early 2011, Apple appears to have changed its practice to require the input of a

26  password for every individual purchase, thereby ending the fifteen minute purchase window.

27  Apple ostensibly made this change because the FTC was about to commence an investigation

28

into Apple's improper sales practices.  Even after this change, Apple continues to sell Game

Currency to minors.  Minors thirteen and older are permitted to open their own Apple accounts,

and minors younger than thirteen may purchase Game Currency by using their parents' general

Apple password (no special Apple password is required to purchase Game Currency).

23.    As alleged above, many games are targeted to young children, and are free or cost

a nominal charge to download.  These games, however, are often designed solely to lure children

to purchase Game Currency in order to meet the objectives of the game.  We sometimes refer to

these free Apps in this complaint as "bait Apps."

24.    Such games, by design, are highly addictive.  They were developed strategically

to induce purchases of Game Currency.  For example, the game "Smurfs' Village" is free to

download.  The object of the game, however, is to build a virtual village, and the construction

process is greatly sped up by the purchase of "Smurfberries," Game Currency that costs real

money.  Embedded in the Smurf Village bait App, the "Smurfberry Shop" offers different

amounts of Smurfberries for sale.  Fifty Smurfberries cost $4.99; 1,000 Smurfberries cost

$59.00; and 2,000 Smurfberries cost $99.99.  *See* the following screen shots of Smurfs' Village:





25.    The Smurfs' Village App indicates that it is designed for ages 4-plus.

26.    A news story about Apple's bait Apps business scheme states:

The Federal Trade Commission has confirmed it will investigate mobile games that are advertised as free but then entice players into buying virtual goods within the game, especially those that target younger users. This comes after several complaints surfaced by parents who found out their children were racking up huge purchases without understanding what they were doing, including one young gamer who managed to download more than $1,400 in virtual Smurfs currency.

Smurfs Village leads the headlines for this story. It's a "free" iPhone game clearly targeting a young demographic. Once in the game, players are asked to spend Smurfberries at every turn. That problem is solved easily enough with a menu that offers the ability to buy more berries. Even though Smurfberries aren't real, the money used to buy them is.

Players are lured in by enticing pictures of huge bucketfuls of Smurfberries, and just a couple taps is all it takes to drain money out of an iPhone account holder's credit card and make players flush with in-game funds.

1   The app does ask users to confirm purchases, but as the FTC notes, some users
2   may not fully understand what they're confirming. "Consumers, particularly
    children, are unlikely to understand the ramifications of these types of purchases,"
3   wrote FTC chairman Jon Leibowitz in a statement.

4   Massachusetts Congressman Edward Markey responded, "What may appear in
    these games to be virtual coins and prizes to children result in very real costs to
5   parents. I am pleased that the FTC has responded, and as the use of mobile apps
    continues to increase, I will continue to actively monitor developments in this
6   important area."

7   The Smurfs game has gained so much attention because it exploded to the #1
    spot of top-earning iPhone games. That's when the media learned of the easy
8   microtransaction system in the game. There's even a button to purchase $100 in
    Smurfberries, which most rational, hard-working people would probably never
9   click, but appears mouthwatering to players who think they're just innocently
    playing a game.

10  While some of the charges definitely come as the result of a parent legitimately
    buying berries for their kid, there is also controversy over the 15-minute user
11  authentication buffer. A dad could download the Smurfs game onto his iPad and
    hand it over to his daughter to play. The daughter can then rack up as many
12  charges as she wants for 15 minutes before the app will ask for re-verification of
    the account. Before you know it, your credit card statement's been smurfed right
13  in the smurf.

14  Mark Raby, *FTC agrees to investigate "deceptively free" iPhone games*,

15  http://www.gamesradar.com/iphone/iphone/news/z/a-2011022318018755018/g-

16  201010071388669064.

17      27.     Smurfs' Village is a tremendous moneymaker for Apple.  Many children have

18  purchased thousands of dollars of Game Currency over the course of a brief period of time, and

19  the App developer of Smurfs' Village has earned approximately $4 million a month selling

20  Smurfberries.

21      28.     Smurfs' Village is by no means the only bait App that preys on children in such a

22  manner.  Apple offers many games that use the same bait-and-switch business scheme as

23  Smurfs' Village.  Apple entices children with a free download of a gaming platform that then

24  offers the sale of irresistible Game Currency in order to enjoy the game as it was designed to be

25  "played."  These games have no redeeming purpose whatsoever.  Within seconds of "playing"

26  them, one is led to a screen that sells virtual currency, so that the "player" can build things or

27  "have" other virtual things.  Such games include "Tap Zoo," which in April 2011 was the

28

1    number one revenue generating App.   Tap Zoo sells virtual trunks, satchels, pouches and vials

2    of coins and stars, which are then used  to purchase virtual animals.

3          29.     What is particularly egregious about Tap Zoo is that the store lists items for sale,

4    but does not reveal how much the items cost.  That only occurs when a confirmation window is

5    displayed.  To illustrate, *see* the following screen shots of the new number one App Tap Zoo:

6

7

8

9

10

11

12

13                          

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







1

2

3

4

5

6

7

8

9

10

11

12

13

14

15



16    30.     Other bait Apps include "Bakery Story" (which sells virtual gems that are used to

17 acquire items for the virtual bakery), "Treasure Story" (which sells virtual gems), "City Story"

18 (which sells virtual cash), "Tap Fish" (which sells virtual "fish bucks"), "Glass Tower" (which

19 sells virtual "level packs"), "Sundae Maker" (which sells virtual ice cream and toppings), "Cake

20 Maker" (which sells virtual cake ingredients and other cake-making items), and many, many

21 others.  In light of how much revenue is flowing to Apple through Smurfs' Village, it is clear that

22 these games, taken collectively, put substantial sums in Apple's coffers.

23    31.     The targeting of children by Apple and inducing them to purchase, without the

24 knowledge or permission of their parents, millions of dollars of Game Currency is unlawful

25 exploitation in the extreme.  Fortunately for the members of the Class, such purchases of Game

26 Currency constitute voidable contracts because they were entered into with minors.

27    32.     Apple has not offered to return to its account holders any of the millions of dollars

28

1   it received from their minor children's purchases of Game Currency.

2   **V.      CLASS ACTION ALLEGATIONS**

3          33.     Plaintiffs bring this action as a class action for declaratory, equitable and

4   monetary relief pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on

5   behalf of the following class:  All persons in the United States who paid for a purchase of Game

6   Currency made by their minor children without their knowledge or permission (the "Class").

7   Excluded from the Class are Apple; any entity in which it has a controlling interest; any of its

8   parents, subsidiaries, affiliates, officers, directors, employees and members of their immediate

9   families; and members of the federal judiciary.

10         34.     The members of the Class are ascertainable, and are so numerous that joinder is

11  impracticable.  Plaintiffs believe there are thousands of members of the Class, whose names and

12  addresses are in Apple's records.

13         35.     There are questions of law or fact common to the Class, and such questions

14  predominate over individual questions.  Apple pursued a common course of conduct toward the

15  Class as alleged.  This action arises out of a common nucleus of operative facts.  Common

16  questions include:

17         (a)     Whether Apple sold Game Currency;

18         (b)     Whether Apple sold Game Currency to minors;

19         (c)     Whether Apple knew that many gaming Apps it sells are designed to
                   induce minors to purchase Game Currency;
20
21         (d)     Whether Apple intended for minors to purchase such Game Currency
                   without the knowledge or permission of the minors' parents or guardians;

22         (e)     Whether Apple's sales to minors of Game Currency constitute voidable
                   contracts;
23
24         (f)     Whether Apple's scheme to induce minors to purchase Game Currency
                   violates California's Consumers Legal Remedies Act, Cal. Civ. Code §
                   1750, and Unfair Competition Law, Business & Professions Code § 17200
25                 *et seq.*;

26         (g)     Whether Apple owed and breached a duty of good faith and fair dealing
                   with respect to its contract with Plaintiffs and the Class;
27
           (h)     Whether Apple was unjustly enriched by its scheme; and
28

---

(i)     Whether Plaintiffs and the Class have been damaged, and if so, in what amount.

36.     Plaintiffs' claims are typical of the claims of other members of the Class, and there is no defense available to Apple that is unique to Plaintiffs.  Plaintiffs paid hundreds of dollars to Apple for purchases of Game Currency made by their minor children without their knowledge or permission.

37.     Plaintiffs will fairly and adequately represent the interests of the Class.  Plaintiffs have no interests that are antagonistic to those of the Class.  Plaintiffs have the ability to assist and adequately protect the rights and interests of the Class during the litigation.  Further, Plaintiffs are represented by counsel who are competent and experienced in this type of class action litigation.

38.     This class action is not only the appropriate method for the fair and efficient adjudication of the controversy, it is the superior method because:

(a)     The joinder of thousands of geographically diverse individual class members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and litigation resources;

(b)     There is no special interest by class members in individually controlling prosecution of separate causes of action;

(c)     Class members' individual claims are relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, expensive, if not totally impossible, to justify individual class members addressing their loss;

(d)     When Apple's liability has been adjudicated, claims of all class members can be determined by the Court and administered efficiently in a manner that is far less erroneous, burdensome, and expensive than if it were attempted through filing, discovery, and trial of many individual cases;

(e)     This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of class claims to promote economies of time, resources, and limited pool of recovery;

(f)     This class action will assure uniformity of decisions among class members;

(g)     Without this class action, restitution will not be ordered and Apple will be able to reap the benefits or profits of its wrongdoing; and

(h)     The resolution of this controversy through this class action presents fewer management difficulties than individual claims filed in which the parties may be subject to varying indifferent adjudications of their rights.

39.     Further, class certification is appropriate because Apple has acted, or refused to

1    act, on grounds generally applicable to the Class, making class-wide equitable, injunctive,

2    declaratory and monetary relief appropriate.  In addition, the prosecution of separate actions by

3    or against individual members of the Class would create a risk of incompatible standards of

4    conduct for Apple and inconsistent or varying adjudications for all parties.  A class action is

5    superior to other available methods for the fair and efficient adjudication of this action.

6    **VI.    CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS**

7           40.      California's substantive laws apply to every member of the Class, regardless of

8    where in the United States the class member resides.  Apple imposes on its account holders a set

9    of Terms and Conditions that must be accepted before becoming an account holder and before

10   making any purchases or downloads from Apple's iTunes Store.  Among such Terms and

11   Conditions is the following:

12          The Services are operated by Apple from its offices in the United States. You
            agree to comply with all local, state, federal, and national laws, statutes,
13          ordinances, and regulations that apply to your use of the Services. All transactions
            on the Services are governed by California law, without giving effect to its
14          conflict of law provisions. Your use of the Services may also be subject to other
            laws. You expressly agree that exclusive jurisdiction for any claim or dispute with
15          Apple or relating in any way to your use of the Services resides in the courts of
            the State of California.
16

17          41.      Further, California's substantive laws may be constitutionally applied to the

18   claims of Plaintiffs and the Class under the Due Process Clause, 14th Amend. § 1, and the Full

19   Faith and Credit Clause, Art. IV § 1 of the U.S. Constitution.  California has significant contact,

20   or significant aggregation of contacts, to the claims asserted by Plaintiffs and all class members,

21   thereby creating state interests that ensure that the choice of California state law is not arbitrary

22   or unfair.

23          42.      Apple's United States headquarters and principal place of business is located in

24   California.  Apple also owns property and conducts substantial business in California. Therefore

25   California has an interest in regulating Apple's conduct under its laws.  Apple's decision to

26   reside in California and avail itself of California's laws, and to engage in the challenged conduct

27   from and emanating out of California, renders the application of California law to the claims

28

1    herein constitutionally permissible.

2         43.    California is also the state from which Apple's alleged misconduct emanated.

3    This conduct similarly injured and affected Plaintiffs and all other class members.

4         44.    The application of California laws to the Class is also appropriate under

5    California's choice of law rules because California has significant contacts to the claims of

6    Plaintiffs and the proposed Class, and California has a greater interest in applying its laws here

7    than any other interested state.

8                              **FIRST CAUSE OF ACTION**
                                **(Declaratory Judgment)**
9

10        45.    Plaintiffs repeat and re-allege herein the foregoing allegations.

11        46.    All Game Currency that Apple presents for sale constitutes an offer to enter into a

12   sales contract.

13        47.    All Game Currency purchased by a minor constitutes acceptance of Apple's offer.

14        48.    Every payment made by the members of the Class for the purchase of Game

15   Currency by their minor children constitutes consideration for the provision of the Game

16   Currency.

17        49.    Accordingly, all transactions that are the subject of this Complaint are possessed

18   of the three elements of a contract, *i.e.*, offer, acceptance and consideration.

19        50.    Under California law, minors have the right to disaffirm contracts such as those at

20   issue here.  *Cal. Fam. Code* § 6710 (2010).

21        51.    A parent or guardian may disaffirm a contract on behalf of a minor.

22        52.    The contracts between Defendant and the members of the Class are voidable – a

23   fact that Defendant denies.

24        53.    Accordingly, there is an actual controversy between the parties, requiring a

25   declaratory judgment.

26        54.    This claim for declaratory judgment is brought pursuant to 28 U.S.C. § 2201 *et*

27   *seq.*, seeking a determination by the Court that: (a) this action may proceed and be maintained as

28

---

1    a class action; (b) the sales contracts between Defendant and the children of the class members,

2    relating to the purchase of Game Currency, are voidable at the option of the respective class

3    members on behalf of their minor children; (c) if the class members elect to void the contracts,

4    they will be entitled to restitution and interest thereon; (d) an award of reasonable attorneys' fees

5    and costs of suit to Plaintiff and the Class is appropriate; and (e) such other and further relief as

6    is necessary and just may be appropriate as well.

### SECOND CAUSE OF ACTION
**(Violation of the California Consumers Legal Remedies Act)**

9        55.    Plaintiffs repeat and re-allege herein the foregoing allegations.

10       56.    At all times relevant hereto, there was in full force and effect the California

11   Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750.

12       57.    Plaintiffs and the other class members are consumers within the meaning of Cal.

13   Civ. Code § 1761(d).

14       58.    Apple violated the CLRA's proscription against the concealment of the

15   characteristics, use, benefit, or quality of goods by actively marketing and promoting certain

16   gaming Apps as "free" or nominal (*e.g.*, 99¢) with the intent to induce from minors the purchase

17   of Game Currency.  Specifically, by promoting such bait Apps in the manner alleged herein,

18   Apple has violated:  (a) § 1770(a)(5)'s proscription against representing that goods have uses or

19   characteristics they do not have;  (b) § 1770(a)(7)'s proscription against representing that goods

20   are of  particular standard or quality when they are of another; (c) § 1770(a)(14)'s proscription

21   against "Representing that a transaction confers or involves rights, remedies, or obligations

22   which it does not have or involve, or which are prohibited by law."

23       59.    Under California law, a duty to disclose arises in four circumstances: (1) when the

24   defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive

25   knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals

26   a material fact from the plaintiff; or (4) when the defendant makes partial representations but

27   also suppresses some material facts.

28

60.     Apple owed a duty to disclose material facts about the Game Currency embedded in games it marketed, advertised and promoted to children as "free" or nominal.  Apple breached such duty as alleged in this Complaint.

61.     Plaintiffs and the Class suffered actual damages as a direct and proximate result of Apple's actions, concealment and/or omissions in the advertising, marketing and promotion of its bait Apps, in violation of the CLRA, as evidenced by the substantial sums Apple pocketed.

62.     Plaintiffs, on behalf of themselves and for all those similarly situated, demand judgment against Apple for equitable relief in the form of restitution and/or disgorgement of funds paid to Apple.

63.     In accordance with § 1782(a) of the CLRA, on April 11, 2011, counsel in *Meguerian v. Apple, Inc.* served Apple, by certified mail, with notice of its alleged violations of the CLRA.

64.     Apple has not met the demand set forth in that letter, and therefore Plaintiffs here seek the following relief under CLRA § 1780, for Apple's violations of CLRA §§ 1770(a)(5) and (a)(7):

•     actual damages under Cal. Civ. Code § 1780(a)(1);

•     punitive damages under Cal. Civ. Code § 1780(a)(4);

•     attorneys' fees and costs under Cal. Civ. Code § 1780(d); and

•     any other relief the Court deems proper under Cal. Civ. Code § 1780(a)(5).

**THIRD CAUSE OF ACTION**
**(Violation of Bus. & Prof. Code § 17200 *et seq.*)**

65.     Plaintiffs repeat and re-allege herein the foregoing allegations.

66.     Plaintiffs bring this cause of action on behalf of themselves, on behalf of the other class members, and in their capacity as a private attorneys general against Apple for its unlawful, unfair, fraudulent and/or deceptive business acts and practices pursuant to California's Unfair Competition Law (UCL), Business & Professions Code § 17200 *et seq.*, which prohibits unlawful, unfair and/or fraudulent business acts and/or practices.

67.     Plaintiffs assert these claims as a representative of an aggrieved group and as private attorneys general on behalf of the general public and other persons who have expended funds that Apple should be required to reimburse under UCL § 17200 *et seq.*

68.     This claim is predicated on the duty to refrain from unlawful, unfair and deceptive business practices.  Plaintiffs and the other class members hereby seek to enforce a general proscription of unfair business practices and the requirement to refrain from deceptive conduct.

69.     The UCL § 17200 *et seq.* prohibits acts of "unfair competition."  As used in this section, "unfair competition" encompasses three distinct types of misconduct: (a) "unlawful…business acts or practices"; (b) "unfair fraudulent business acts or practices"; and (c) "unfair, deceptive or misleading advertising."

70.     Apple violated the UCL by engaging in conduct that violated each of the three prongs identified by the statute, as set forth throughout this Complaint.

71.     Apple committed an *unlawful* business act or practice in violation of the UCL § 17200 *et seq.* when it violated the CLRA.

72.     Apple committed *fraudulent* business acts and practices in violation of the UCL §§ 17200 and 17500 *et seq.* by actively advertising, marketing and promoting its bait Apps as "free" or nominal with the intent to lure minors to purchase Game Currency in a manner likely to deceive the public.

73.     Apple has violated the "unfairness" prong.  According to the Federal Trade Commission guidelines:  "To justify a finding of unfairness the injury must satisfy three tests.  It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided."  FTC Policy Statement On Unfairness, appended to *International Harvester Co.*, 104 F.T.C. 949, 1070 (1984).

74.     As alleged in this complaint, Plaintiffs and the Class have suffered substantial actual economic harm.  Apple's practices produce no countervailing benefits to consumers or competition that outweigh such substantial harm to Plaintiffs and the Class.  Because the injuries

alleged occurred without Plaintiffs' and the other class members' knowledge or permission, Plaintiffs and the Class, *a fortiori*, could not have avoided such injuries.  One cannot avoid something about which one is unaware.  Accordingly, Apple has violated the "unfairness" prong of the UCL.

75.     Apple's deceptive practices were specifically designed to induce the children of Plaintiffs and the other members of the Class to download the bait Apps and then purchase Game Currency.

76.     Apple's practices have deceived and/or are likely to deceive Plaintiffs and members of the consuming public.

77.     As a direct and proximate cause of Apple's violation of the UCL, Plaintiffs and the Class have suffered harm in that they have not been reimbursed for the purchases of Game Currency their children made from Apple without their knowledge or permission.

78.     As a direct and proximate result of Apple's violation of the UCL,  Apple has been unjustly enriched and should be required to make restitution to Plaintiffs and the Class or disgorge its ill-gotten profits pursuant to the UCL § 17203.

79.     Plaintiffs, on behalf of themselves and for all others similarly situated, demand judgment against Apple for injunctive relief in the form of restitution, and/or disgorgement of funds paid to Apple as alleged herein.

**FOURTH CAUSE OF ACTION**
**(Breach of Duty of Good Faith and Fair Dealing)**

80.     Plaintiffs repeat and re-allege herein the foregoing allegations.

81.     Apple's contracts with Plaintiffs and the Class included the term, implied at law in all contracts, requiring the parties to exercise "good faith and fair dealing" in all duties relating to the performance of the contract.  By engaging in the misconduct alleged herein, Apple has breached its contractual duty of good faith and fair dealing with Plaintiffs and the Class.

82.     The elements of a cause of action for breach of the covenant of good faith and fair dealing are: (1) an agreement between the parties, (2) plaintiff's performance, (3) defendant

1  engaged in conduct separate and apart from the performance of obligations under the agreement

2  without good faith and for the purpose of depriving plaintiff of rights and benefits under the

3  agreement, and (4) damages to plaintiff.  All of the necessary elements are pled in this complaint.

4    83. An agreement between Plaintiffs and the other members of the Class, on the one

5  hand, and Apple, on the other, existed.  Plaintiffs and the other members of the Class accepted

6  and agreed to Apple's "Terms & Conditions" when they opened an account with iTunes or any

7  of Apple's other retail stores offering Apps for sale.

8    84. Plaintiffs and the other members of the Class fully performed their duties under

9  the contract.  Those duties are to click one's agreement to Apple's interminably long, unilaterally

10 drafted, uniform Terms & Conditions, and to pay for content with a credit card, debit card or Pay

11 Pal account on file, or with a gift card.  If any member of the Class fails to perform any of his or

12 her duties under the contract, then Apple would not permit the person to open, or keep open, an

13 account, and would prevent a sales transaction from occurring.  In this manner, Apple enjoys a

14 far greater bargaining position than Plaintiffs and the Class.

15   85. Apple engaged in conduct separate and apart from the performance of obligations

16 under the agreement without good faith and for the purpose of depriving Plaintiffs and the Class

17 of rights and benefits under the agreement.  Instead of fairly dealing with a customer who seeks

18 to purchase real, valuable content, Apple, like the Pied Piper, gave away colorful, tempting Apps

19 to its customers' children in the hopes the children will then spend staggering amounts on

20 worthless Game Currency.

21   86. Apple's actions are without good faith and are for the sole purpose of depriving

22 Plaintiffs and the Class of rights and benefits under the contract – *i.e.*, a sales transaction for

23 content the consumer intended to purchase.  Had any Plaintiff or other member of the Class

24 known what their children were purchasing and for how much, they would not have permitted

25 the sales transaction from being consummated.

26   87. That Apple collects millions of dollars from Plaintiffs and the Class, by luring

27 their children to download bait Apps and then spend vast sums on Game Currency without

28

1  parental knowledge or permission, is the quintessence of bad faith and unfair dealing with

2  Plaintiffs and the Class.

3       88.    Plaintiffs and the other members of the Class have suffered damages as a result of

4  Apple's actions.

5

6  **FIFTH CAUSE OF ACTION**
   **(Restitution/Unjust Enrichment/Money Had and Received (alternative claim))**

7       89.    Plaintiffs repeat and re-allege herein the foregoing allegations.

8       90.    Plaintiffs and the Class have conferred benefits on Apple by paying for the Game

9  Currency their children purchased from Apple without their knowledge or permission.

10       91.    Apple knowingly and willingly accepted those monetary benefits from Plaintiffs

11  and the Class.

12       92.    Under the circumstances alleged herein, it is inequitable for Defendant to retain

13  such benefits at the expense of Plaintiffs and the Class.

14       93.    Apple has been unjustly enriched at the expense, and to the detriment of,

15  Plaintiffs and the Class by wrongfully collecting money to which Apple, in equity, is not entitled.

16       94.    Plaintiffs and the Class are entitled to recover from Apple all amounts wrongfully

17  collected and improperly retained by Apple, plus interest thereon.

18       95.    As a direct and proximate result of Apple's unjust enrichment, Plaintiffs and the

19  Class have suffered injury and are entitled to reimbursement, restitution and disgorgement from

20  Apple of the benefits conferred by Plaintiffs and the Class.

21       96.    As a direct and proximate result of Apple's misconduct as set forth herein, Apple

22  has been unjustly enriched.

23       **WHEREFORE**, Plaintiffs, individually and on behalf of the Class, pray for an Order as

24  follows:

25      A.    Finding that this action satisfies the prerequisites for maintenance as a class action

26            under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class defined

27            herein;

28

1      B.    Designating Plaintiffs as representative of the Class and their counsel as class

2           counsel;

3      C.    Entering judgment in favor of Plaintiffs and the Class and against Apple;

4      D.    As to the First Cause of Action, entering a Declaratory Judgment determining that

5           the sales contracts between Defendant and the minor children of class members

6           relating to the purchase of Game Currency are voidable at the option of the

7           respective class members on behalf of their minor children, and that if the class

8           members elect to void the contracts, they will be entitled to restitution, attorneys'

9           fees, costs and interest thereon;

10     E.    As to the Second through Fifth Causes of Action, awarding Plaintiffs and

11          members of the Class their individual damages and attorneys' fees and allowing

12          costs, including interest thereon; and/or restitution and equitable relief;

13     F.    As to all Causes of Action, an injunction discontinuing the Game Currency sales

14          practices targeting minors complained of herein, and awarding attorneys' fees and

15          allowing costs, including interest thereon; and

16        G.    Granting such further relief as the Court deems just.

17 **VII.    JURY DEMAND**

18     Plaintiffs demand a trial by jury on all issues so triable.

19

20 Dated: June 16, 2011                 **BERMAN DEVALERIO**

21                           By: _Christopher Heffelfinger_      by ADP

22                               Christopher T. Heffelfinger     with authorization

23                         Joseph J. Tabacco, Jr.

24                         Anthony D. Phillips
                               One California Street, Suite 900

25                         San Francisco, CA 94111
                               (415) 433-3200

26

27                         *Proposed Interim Liaison Counsel for Plaintiffs*

28

**BONI & ZACK LLC**

By: *Michael Boni*  / by ADP
      with authorization.
    Michael J. Boni

Joshua D. Snyder
15 St. Asaphs Road
Bala Cynwyd, PA 19004
(610) 822-0200

*Proposed Interim Co-Lead Counsel for Plaintiffs*

Simon Bahne Paris
Patrick Howard
**SALTZ, MONGELUZZI, BARRETT &
BENDESKY, P.C.**
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
(215) 575-3986

*Proposed Interim Co-Lead Counsel for Plaintiffs*

Jonathan Shub
**SEEGER WEISS, LLP**
1515 Market Street
Philadelphia, PA 19102
(215) 564-2300

Benjamin G. Edelman
**LAW OFFICES OF BENJAMIN EDELMAN**
27A Linnaean Street
Cambridge, MA 02138
(617) 359-3360

Roberta D. Liebenberg
Jeffrey S. Istvan
Gerard A. Dever
**FINE, KAPLAN AND BLACK, R.P.C.**
1835 Market Street, 28th Floor
Philadelphia, PA 19103
(215) 567-6565

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Shanon J. Carson
Sarah R. Schalman-Bergen
**BERGER & MONTAGUE, P.C.**
1622 Locust St.
Philadelphia, PA 19103
(215) 875-3000

*Attorneys for Plaintiffs*